## No. 1464.—J. McWilliams v. Bryan & Irvine.

A contract or partnership between two parties, the one residing within the Federal lines of military occupation and the other within the lines of the insurrectionary forces, during the late war, for the purpose of carrying on a commercial business in the purchase and sale of cotton between the contending parties, was in conflict with the act of Congress of July 13, 1861, prohibiting all commercial intercourse between the contending parties. The rights and obligations growing out of such business relations being in contravention of a prohibitory law cannot be judicially enforced.

APPEAL from Fifth District Court of New Orleans. *Leaumont, J. G. L. Bright* and *Barrow & Pope*, for plaintiff and appellant, *J. P. Dillingham* and *J. M. Bonner*, for defendants and appellees.

TALIAFERRO, J. The plaintiff alleges that the defendants, as commercial partners, are indebted to him in the sum of eighty-six thousand five hundred and forty-seven dollars and thirty-five cents with five per cent. interest thereon from the twenty-third of October, 1865. He predicates this indebtedness upon an alleged contract entered into on the tenth of February, 1864, by which the defendants sold to him 869 bales of cotton, every bale to weigh 400 pounds, for which he was to pay twenty-five cents per pound. He avers that he did pay in cash at the time twenty cents per pound, making the sum of sixty-nine thousand five hundred and twenty dollars, that defendants delivered the amount of thirty-two thousand five hundred and seventy-two dollars and sixty-five cents worth of cotton, expenses deducted; that 496 bales have not been delivered, and from the failure of the defendants to deliver them plaintiff has been damaged twenty-five cents per pound on the cotton which they have so failed to deliver, this being the difference between the price stipulated to be given and that which it would have brought on the twenty-third of October, 1865.

The defendant, Irvine, was alone cited. He answered by specially denying that a partnership existed between himself and Bryan, as alleged by plaintiff, and by charging that at the time of entering into this alleged contract (tenth February, 1864), the contracting parties resided on opposite sides of the lines between the territory at that time occupied by the Federal and insurrectionary forces during the late war; that the trade carried on by them was forbidden by law, and consequently that no engagements that may have been entered into at the time and under the circumstances relating to the transactions now by this suit brought into view can have any legal or binding effect. There was judgment in the court below dismissing the action of the plaintiff, and he prosecutes this appeal.

An attentive perusal of the voluminous record presented in this case satisfies us that the question of partnership so elaborately discussed by counsel will not require at our hands any special scrutiny. Neither will the bills of exception taken in regard to the admission of evidence, of which we find two in the record, need to be examined for the pur-

pose of deciding upon them. We therefore pretermit any inquiries on these subjects, and shall confine ourselves to the issue involving the legality of the transactions lying at the foundation of the controversy between the parties.

At the date of these transactions war existed in the country. Portions of the State were in the military occupancy of the national forces, and portions held in the same manner by the insurrectionary power. This was during the year 1864, in the early part of which the cotton arrangements between these litigants took place. Under the act of Congress of thirteenth July, 1861, all commercial intercourse between the inhabitants of a territory in insurrection and those of a territory not in insurrection, except under the license of the President and according to regulations prescribed by the Secretary of the Treasury, was entirely prohibited. See Statutes at large, vol. 12, p. 257.

On the eleventh of September, 1863, the Secretary of the Treasury promulgated a series of trade regulations, authorized by the act of Congress we have referred to, and among these regulations it is provided that "commercial intercourse with localities beyond the lines of military occupation by the United States forces is strictly prohibited, and no permit will be granted for the transportation of any property to any place under the control of insurgents against the United States." In pursuance of the act of Congress of thirteenth of July, 1861, authorizing it, the President of the United States on the sixteenth of August of that year issued a proclamation declaring certain States, among which was the State of Louisiana, to be in a state of insurrection. Several localities were exempted from its operation. Among them were such parts of the States mentioned, " as may be from time to time occupied and controlled by forces of the United States engaged in the dispersion of the insurgents." See Statutes at large, vol. 12, page 1262, appendix.

In what localities at the time of these cotton contracts did the parties to them reside? The petition in its outset avers that "the commercial firm of Bryan & Irvine sold to plaintiff on the tenth day of February, 1864, by written contract 169 bales of cotton," etc. Pilcher, one of the witnesses, says: "McWilliams resided at Plaquemines in February, 1864," and that "Plaquemines was at that time within the Federal lines." General Sheldon, an officer of the United States army, says: "I went to Plaquemine twenty-first November, 1863, and remained continuously every day until twenty-sixth or twenty-seventh of March, 1864. Plaquemine was occupied by the Federal forces, and was wholly within the picket lines of my command. From the time I went there Plaquemines was continuously occupied by the Federal forces until the surrender. McWilliams resided at Plaquemine and kept a store there; told me soon after I went there he had taken the oath of allegiance." McWilliams, it is elsewhere in the record shown, took the oath of allegiance to the United States in November, 1862. It appears that David

N. Barrow was the agent in the greater part of these transactions of the plaintiff. Hamilton, a witness, says: "In February, 1864, Irvine lived in Woodville, Mississippi; I lived there then myself." Scott, a witness, testifies that "Irvine resided during the war within the military lines of the Confederates." Shields, another witness, states that "Barrow bought of Irvine between the first' and tenth of February, 1864, a lot of cotton. At that time Irvine lived in Confederate lines and Barrow in Federal lines." This purchase of cottton spoken of by Shields, there cannot be a remaining doubt, is the one alleged by plaintiff to have been entered into on the tenth of February, 1864. The effort of plaintiff to show that only a fort erected by the Federal forces at Plaquemine was within the Federal lines is weak and abortive. We think the evidence establishes fully and conclusively that McWilliams, the plaintiff, at the time of the contract declared upon was residing in Plaquemine; that his residence there was a fixed residence from the fact of his having taken the oath of allegiance to the United States, and having a store and selling merchandise there, which he no doubt did by permission of the Federal authorities. It is equally established beyond doubt that Bryan & Irvine, at the time of their negotiations in cotton with McMasters & Barrow, were permanent residents within the so-called Confederate lines. It is clear then that the contract sought to be enforced by this action was entered into in contravention of a prohibitory law, and cannot therefore have legal effect. This court has repeatedly declared that it will entertain no action of this sort founded in derogation of peremptory law.

It is therefore ordered, adjudged and decreed that the judgment of the District Court be affirmed with costs in both courts.